# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT


**SOUTH-TEK SYSTEMS, LLC, and**
**POTTER ELECTRIC CO, LLC,**
**Petitioners/Appellants**

**v.**                                                    **Appeal No. 2017-2297**

**ENGINEERED CORROSION SOLUTIONS, LLC,**
**Patent Owner/Appellee**

**Proceeding No.: IPR2016-00136**


## NOTICE FORWARDING CERTIFIED LIST

A Notice of Appeal to the United States Court of Appeals for the Federal Circuit was

timely filed July 12, 2017, in the United States Patent and Trademark Office in connection with

the above identified *Inter Partes Review* proceeding. Pursuant to 35 U.S.C. § 143, a Certified

List is this day being forwarded to the Federal Circuit.

Respectfully submitted,

Date:  August 22, 2017

By: *Macia L. Fletcher*
Macia L. Fletcher
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035


Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing NOTICE

FORWARDING CERTIFIED LIST has been served, via electronic mail, on counsel for

Appellants and Appellee this 22nd day of August, 2017, as follows:

PETITIONERS

Edward H. Green, III
David E. Bennett
COATS & BENNETT, PLLC
egreen@coatsandbennett.com
dbennett@coatsandbennett.com

PATENT OWNER

Michael J. Thomas
Bryan K. Wheelock
HARNESS, DICKEY & PIERCE, PLC
mthomas@hdp.com
bwheelock@hdp.com

By: *Macia L. Fletcher*
Macia L. Fletcher
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

**August 22, 2017**

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

### SOUTH-TEK SYSTEMS, LLC and POTTER ELECTRIC CO, LLC,
**Petitioners,**
v.

### ENGINEERED CORROSION SOLUTIONS, LLC,
**Patent Owner.**

**Case: IPR2016-00136**
**Patent No. 9,144,700 B2**

By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

*Certifying Officer*



**Prosecution History – IPR2016-00136**

| Date | Document |
| --- | --- |
| 11/19/2015 | Petition for Inter Partes Review |
| 11/19/2015 | Petitioner's Power of Attorney (South-Tek Systems) |
| 11/19/2015 | Petitioner's Power of Attorney (Potter Electric Signal Company) |
| 11/24/2015 | Notice of Filing Date Accorded to Petition |
| 12/9/2015 | Patent Owner's Mandatory Notices |
| 2/24/2016 | Patent Owner's Preliminary Response |
| 5/12/2016 | Decision - Institution of Inter Partes Review |
| 5/12/2016 | Scheduling Order |
| 5/26/2016 | Patent Owner's Request for Rehearing |
| 6/10/2016 | Petitioners' List of Proposed Motions in Advance of Initial Conference Call |
| 6/21/2016 | Order - Authorizing Petitioners'Motion to Submit Supplemental Information |
| 6/23/2016 | Petitioners' ADR Statement |
| 6/27/2016 | Petitioners' Motion to File Supplemental Information |
| 6/27/2016 | Exhibit A - Motion to File Supplemental Information |
| 6/27/2016 | Exhibit B - Motion to File Supplemental Information |
| 6/27/2016 | Exhibit C - Motion to File Supplemental Information |
| 6/27/2016 | Exhibit D - Motion to File Supplemental Information |
| 6/27/2016 | Exhibit E (Part 1) - Motion to File Supplemental Information |
| 6/27/2016 | Exhibit E (Part 2) - Motion to File Supplemental Information |
| 7/5/2016 | Patent Owner's Opposition to Motion to File Supplemental Information |
| 8/3/2016 | Order - Motion to File Supplemental Information |
| 8/4/2016 | Joint Notice of Stipulation to Modify the Scheduling Order |
| 8/9/2016 | Decision - Request for Rehearing |
| 8/26/2016 | Patent Owner's Response to Petition |
| 8/27/2016 | Patent Owner's Motion to Seal |
| 11/22/2016 | Second Joint Notice of Stipulation to Modify the Scheduling Order |
| 12/5/2016 | Petitioners' Reply to Patent Owner's Response to Petition |
| 12/9/2016 | Third Joint Notice of Stipulation to Modify the Scheduling Order |
| 12/12/2016 | Patent Owner's Objections to Evidence |
| 12/12/2016 | Notice of Deposition - Friesen |
| 12/15/2016 | Order - Authorizing Patent Owner to File a List of Reply Arguments It Considers Improper and Authorizing Petitioner to File a Response |
| 12/21/2016 | Patent Owner's List of Improper Reply Arguments |
| 12/28/2016 | Petitioners' Reply to Patent Owner's List of Allegedly Improper Reply Arguments |
| 1/4/2017 | Fourth Joint Notice of Stipulation to Modify the Scheduling Order |
| 1/6/2017 | Patent Owner's Request for Oral Hearing |
| 1/11/2017 | Petitioners' Request for Oral Argument |
| 1/11/2017 | Patent Owner's Motion for Cross-Examination Observation on Petitioners' Reply Witness |
| 1/11/2017 | Patent Owner's Updated Exhibit List |
| 1/11/2017 | Patent Owner's Motion to Exclude |
| 1/19/2017 | Petitioners' Response to Motion for Cross-Examination Observation on Petitioners' Reply Witness |
| 1/19/2017 | Petitioners' Response to Motion to Exclude |

**Prosecution History – IPR2016-00136**

| Date | Document |
|---|---|
| 1/23/2017 | Order - Conduct of the Proceedings - Oral Argument |
| 1/23/2017 | Patent Owner's Reply to Response to Motion to Exclude |
| 1/27/2017 | Patent Owner's Motion for Live Testimony at Oral Argument |
| 1/31/2017 | Petitioners' Opposition to Motion for Live Testimony at Oral Argument |
| 2/1/2017 | Decision - Motion for Live Testimony at Oral Argument |
| 4/7/2017 | Oral Hearing Transcript |
| 5/10/2017 | Final Written Decision |
| 6/9/2017 | Patent Owner's Unopposed Motion for Preservation of the Record |
| 7/11/2017 | Order - Motion for Preservation of the Record |

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

SOUTH-TEK SYSTEMS, LLC AND POTTER ELECTRIC CO, LLC,
Petitioners,

v.

ENGINEERED CORROSION SOLUTIONS, LLC,
Patent Owner.
_____

IPR2016-00136
Patent 9,144,700 B2
_____

Before WILLIAM V. SAINDON, BARRY L. GROSSMAN, and
JEREMY M. PLENZLER, *Administrative Patent Judges.*

GROSSMAN, *Administrative Patent Judge.*

FINAL WRITTEN DECISION

*Incorporating Decision on*
Patent Owner's Motion to Exclude Evidence
*35 U.S.C. § 318(a)*; *37 C.F.R. § 42.73*

# I.   INTRODUCTION

## A.  Background

South-Tek Systems, LLC and Potter Electric Co, LLC ("Petitioners") filed a Petition requesting *inter partes* review of claims 1–9 of U.S. Patent No. 8,474,700 (Ex. 1001, "the '700 patent") pursuant to 35 U.S.C. §§ 311–319.  Paper 3 ("Pet.").  Engineered Corrosion Solutions, LLC ("Patent Owner") filed a Preliminary Response to the Petition.  Paper 7 ("Prelim. Resp.").  We instituted review on two of the four grounds asserted in the Petition.  Paper 8 ("Dec. Inst.").  The two grounds on which we instituted trial were: (1) whether claims 1, 2, and 5–9 of the '700 patent would have been obvious under 35 U.S.C. § 103[1] in view of Viking[2], AAPA[3], and Wood[4]; and (2) whether claims 3 and 4 of the '700 patent would have been obvious under 35 U.S.C. § 103 in view of Viking, AAPA, Wood, and Wagner[5].

Patent Owner requested rehearing of our Decision to Institute an *inter partes* review (Paper 10), which we denied (Paper 25, Dec. Reh'g.).

Patent Owner filed a Response to the Petition (Paper 27, "PO Resp."), and Petitioners filed their Reply (Paper 30, "Pet. Reply").

---

[1] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 296–07 (2011), took effect on September 16, 2012. Because the application for the patent at issue in this proceeding has an effective filing date before that date, we refer to the pre-AIA versions of the statute.

[2]  Viking Corp. Technical Data, Dry Pipe Sprinkler System (dated Mar. 2, 2007) (Ex. 1008).

[3]  Applicant Admitted Prior Art.  The only admitted prior art relied on in the Petition is the reference to manufacturers of suitable nitrogen generators at column 10, lines 55–62 of the '700 patent.

[4]  U.S. Patent No. 6,540,028 (issued Apr. 1, 2003) (Ex. 1009).

[5]  U.S. Patent No. 7,717,776 (issued May 18, 2010) (Ex. 1010).

Petitioners submitted 21 exhibits (Ex. 1001–1021). Patent Owner submitted 93 exhibits (Ex. 2001–2093).

A hearing was held February 6, 2017. Paper 51 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. We enter this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

We also address herein Patent Owner's Motion to Exclude Evidence (Paper 43 ("Mot. Excl.")); Petitioners' Response thereto (Paper 45 ("Resp. Mot. Excl.")); and Patent Owner's Reply (Paper 47 ("Reply Mot. Excl.")).

Petitioners have the burden of proving a proposition of unpatentability by a preponderance of the evidence. 35 U.S.C. § 316(e). As described below, we determine that Petitioners have not met their burden to establish that claims 1–9 are unpatentable.

### B. Related Proceedings

Petitioners state they "are not aware of any other judicial or administrative matter that would affect, or be affected by, a decision" in this proceeding. Pet. 4.

Patent Owner states "[t]his *inter partes* review may affect or be affected by" U.S. Patent No. 9,186,533 and four pending patent applications. Paper 6, 2.

### C. The '700 Patent (Ex. 1001)

The '700 patent relates to a fire protection system, such as those typically found in hotels, offices, and other commercial buildings. A basic fire protection system includes a water supply to provide adequate pressure and water flow to a water distribution piping system, where the water is discharged via sprinklers or nozzles. Ex. 1001, 1:8–12.

One of the problems of these fire protection systems is corrosion, which can severely compromise the performance of the system. *Id.* at 1:22–37. The '700 patent discloses a water-based fire protection system that is intended to reduce corrosion within the system. *Id.* at 2:19-22.

Rather than fill the distribution piping with pressurized air, the fire protection system disclosed in the '700 patent fills the distribution piping with pressurized nitrogen, from a nitrogen generator. *Id.* at 2:26–37. Oxygen dissolved in water or otherwise present within the fire protection system is displaced by the nitrogen in order to reduce or eliminate effects of oxidative corrosion of ferrous and cuprous components and to deprive aerobic microbiological organisms the opportunity to grow within the system. *Id.* at 4:38–45. The displaced oxygen exits the system through a vent. *Id.* at 2:66–3:3.

The patent discloses both "dry pipe" and "wet pipe" systems. *Id.* at 2:53–54. In the ready or stand-by mode, a "dry pipe" system is filled with pressurized gas. *Id.* at 5:15–16; 13:54–57. A "wet pipe system" is filled with pressurized water. *Id.* at 16:39–41. The Specification states that a dry pipe system is used primarily to protect unheated structures or areas where the system is subject to freezing temperatures. *Id.* at 5:4–9; 13:63–64. The Specification also states that in conventional dry pipe sprinkler systems, pools of residual water often are left from initial hydrostatic testing, from periodic flow testing, or from condensation of moist air that is used to maintain system pressure. *Id.* at 5:11–15.

The disclosed dry pipe system is illustrated in Figure 1 of the '700 patent, reproduced below with annotations to identify specific components.



Figure 1 from the '136 patent showing
the disclosed dry pipe sprinkler system,
annotated to highlight selected components.

In operation, a dry pipe sprinkler system may be configured to continuously supply pressurized nitrogen into a piping network using nitrogen generator 25. Ex. 1001, 11:10–13. The nitrogen generator provides a steady stream of pressurized nitrogen into the sprinkler system to keep dry pipe valve 23 closed. *Id.* at 11:13–15. As explained in the Specification,

> To prevent over-pressurization, the system may include *a vent, such as a relief valve*, in order to control or limit the pressure in the system. *The relief valve* allows pressurized nitrogen to escape at a preset or adjustable limit to prevent over-pressurization while maintaining enough pressure within the system to prevent the dry pipe valve from opening.

*Id.* at 11:15–23 (emphases added). Continuous venting of the system using one or more vents or valves facilitates removal of any oxygen within the system while maintaining the required system pressure of nitrogen to keep the dry pipe valve closed. *Id.* at 11:29–32.

As shown in Figure 1, the "vent" is illustrated in Figure 1 simply as a box labeled "vent" using reference numeral 70. *See id.* at Figure 1, upper right corner. With respect to the vent in a dry pipe system, the Specification states further only that "[o]ne or more oxygen sensors 51 are positioned near the inspector's test valve 47 and inspector's test drain 49, adjacent to system vents 70." *Id.* at 16:20–23. Thus, concerning the claimed "vent," the only structure disclosed is *a relief valve* that functions to control or limit the pressure in the system.

Drum drip 39 and drain valve and plug 41 are positioned in the piping network. A drum drip is a condensate drain. Reply 12–13. In the event the fire protection system is actuated, due to a fire or for testing, sprinklers 43, 45 open, pressure within the piping network is lost through the open sprinklers faster than the nitrogen generator can replace it, even when continuously applying pressurized nitrogen, thereby allowing the dry pipe valve to open and pressurized water to enter the piping network and exit through sprinklers 43, 45.

The '700 patent also discloses a wet pipe sprinkler system, which it states is used in structures not subject to freezing. The claims of the patent, however, specifically recite a "dry pipe sprinkler system."

*D. Illustrative Claim*

The sole independent claim, claim 1, reproduced below, is illustrative of the claims in the '700 patent.

1. A water-based fire protection system comprising:

    a dry pipe sprinkler system comprising at least one fusible sprinkler, a source of pressurized water, a piping network connected to the at least one fusible sprinkler, one or more drains, and a dry pipe valve coupling the source of pressurized water to the piping network, the dry pipe valve having a clapper, the piping network pitched toward the one or more drains, and *the one or more drains including a drum drip*;

    a nitrogen generator coupled to the piping network, the nitrogen generator operable to pressurize the piping network with nitrogen and maintain the clapper of the dry pipe valve in a closed position until the water-based fire protection system is actuated; and

    *at least one vent positioned within the piping network*, the at least one vent operable to allow gas including oxygen displaced by the nitrogen to exit the piping network at a preset or adjustable limit while maintaining enough pressure within the system to prevent the clapper of the dry pipe valve from opening until the water-based fire protection system is actuated to thereby increase the concentration of nitrogen and decrease the concentration of oxygen in the piping network to reduce or eliminate the rate of corrosion in the piping network. (Emphasis added).

## II.    PATENT OWNER'S MOTION TO EXCLUDE

Before addressing the merits of this proceeding, we consider Patent Owner's motion to exclude evidence.

Patent Owner moves to exclude paragraphs 5, 11, 13–22, 24–29 and 33 of the Declaration of J. Scott Friesen (Exhibit 1013) and Exhibits 1014 and 1019, submitted with Petitioners' Reply, as well as portions of Mr. Friesen's deposition testimony (Exhibit 2093). Mot. Excl. 1.

### A. Exhibit 1013

Exhibit 1013 is an expert Declaration of Mr. J. Scott Friesen. It was submitted with Petitioners' Reply. It is not cited in the Petition. Patent

Owner seeks to exclude Mr. Friesen's Declaration in its entirety as untimely. Mot. Excl. 2, 7. Patent Owner also moves to exclude portions of Mr. Friesen's Declaration testimony that: (1) raise irrelevant new arguments (*id.* at 1, 2); (2) were not cited in the Reply and thus are irrelevant (*id.* at 1, 3–5); (3) lack foundation (*id.* at 1, 5); and (4) do not support the proposition for which they are cited and thus are irrelevant (*id.* at 1, 6).

A motion to strike or a motion to exclude is not the proper mechanism for raising the issue of whether a reply or reply evidence is beyond the proper scope. *FLIR Systems, Inc. v. Leak Surveys, Inc.*, slip op. 10–12, IPR2014-00411 (PTAB September 3, 2015) (Paper 113). The Board acts as both the gatekeeper of evidence and as the weigher of evidence. Rather than excluding evidence that is allegedly confusing, misleading, untimely, and/or irrelevant, we will simply not rely on it or give it little weight, as appropriate, in our analysis. Similar to a district court in a bench trial, the Board, sitting as a non-jury tribunal with administrative expertise, is well positioned to determine and assign appropriate weight to evidence presented, including giving it no weight. *See, e.g.*, *Donnelly Garment Co. v. NLRB*, 123 F.2d 215, 224 (8th Cir. 1941) ("One who is capable of ruling accurately upon the admissibility of evidence is equally capable of sifting it accurately after it has been received . . . .").

Thus, in this *inter partes* review, the better course is to have a complete record of the evidence to facilitate public access as well as appellate review. Also, we are encouraged to consider all evidence of record that is probative of the background knowledge of a person of ordinary skill in the relevant technology. *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362–63 (Fed. Cir. 2013).

Accordingly, we deny the motion to exclude Exhibit 1013 or portions of it.

## B. Exhibit 1014

Exhibit 1014 is U.S. Patent No. 6,102,066. We have not cited or relied on this exhibit in reaching our decision in this proceeding. Based on the analysis above, we deny the motion to exclude Exhibit 1014.

## C. Exhibit 1019

Exhibit 1019 is an 11 page document titled "Practical Guide to Diagnosis & Mitigation of Microbiologically Influenced Corrosion (MIC) in Fire Protection Systems." It was distributed by BTI Products, LLC. We have not cited or relied on this exhibit in reaching our decision in this proceeding. Based on the analysis above, we deny the motion to exclude Exhibit 1019.

## D. Exhibit 2093

Exhibit 2093 is the deposition testimony of Mr. Scott Friesen, Petitioners' declarant. The testimony Patent Owner seeks to exclude relates to Mr. Friesen's prior use of nitrogen gas. We have not cited or relied on this exhibit in reaching our decision in this proceeding. Based on the analysis above, we deny the motion to exclude selected testimony from Exhibit 2093.

## III.    ANALYSIS

### A. Claim Construction

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016). Under

that standard, and absent any special definitions, we give claim terms their ordinary and customary meaning, as would be understood by one of ordinary skill in the art at the time of the invention. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Any special definitions for claim terms must be set forth with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Only terms that are in controversy need to be construed, and then only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

Petitioners propose a specific construction for the phrase "drum drip." Pet. 6–7. Patent Owner does not propose any specific constructions in its Response. In our Decision to Institute, we determined that an explicit construction of the claim term "drum drip," or any other claim term, was not necessary for the purposes of our Decision to Institute. Dec. Inst. 7. We maintain this determination for this Final Decision – specific construction of the claims is not necessary to resolve this *inter partes* review proceeding.

### B. Grounds of Unpatentability

#### 1. Claims 1, 2 and 5–9
#### Obviousness Based on Viking, Wood, and AAPA

Section 103(a) forbids issuance of a patent when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art;

(2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when available, secondary considerations, such as commercial success, long felt but unsolved needs, and failure of others. *Graham v. John Deere Co*., 383 U.S. 1, 17–18 (1966); *see KSR*, 550 U.S. at 407 ("While the sequence of these questions might be reordered in any particular case, the [Graham] factors continue to define the inquiry that controls."). The Court in *Graham* explained that these factual inquiries promote "uniformity and definiteness," for "[w]hat is obvious is not a question upon which there is likely to be uniformity of thought in every given factual context." 383 U.S. at 18.

The Supreme Court made clear that we apply "an expansive and flexible approach" to the question of obviousness. *KSR*, 550 U.S. at 415. Whether a patent claiming the combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions. *Id*. at 417. To reach this conclusion, however, it is not enough to show merely that the prior art includes separate references covering each separate limitation in a challenged claim. *Unigene Labs., Inc. v. Apotex, Inc*., 655 F.3d 1352, 1360 (Fed. Cir. 2011). Rather, obviousness additionally requires that a person of ordinary skill at the time of the invention "would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention." *Id*.

Moreover, in determining the differences between the prior art and the claims, the question under 35 U.S.C. § 103 is not whether the differences themselves would have been obvious, but whether the claimed invention as a whole would have been obvious. *Litton Indus. Prods., Inc. v. Solid State*

*Sys. Corp.*, 755 F. 2d 158, 164 (Fed. Cir. 1985) ("It is elementary that the claimed invention must be considered as a whole in deciding the question of obviousness.") (citation omitted); *see also Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1537 (Fed. Cir. 1983) ("[T]he question under 35 U.S.C. § 103 is not whether the differences themselves would have been obvious. Consideration of differences, like each of the findings set forth in *Graham*, is but an aid in reaching the ultimate determination of whether the claimed invention as a whole would have been obvious.") (Citation omitted).

"A reference must be considered for everything it teaches by way of technology and is not limited to the particular invention it is describing and attempting to protect." *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985).

As a factfinder, we also must be aware "of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning." *KSR*, 550 U.S. at 421. This does not deny us, however, "recourse to common sense" or to that which the prior art teaches. *Id.*

Against this general background, we consider the references, other evidence, and arguments on which the parties rely.

### a. Scope and Content of the Prior Art

#### i. Viking (Ex. 1008)

Viking is a six page document titled "[T]echnical Data [–] 'Dry Pipe Sprinkler System.'" It describes the components, applications, operation, and maintenance of a dry pipe sprinkler system. Ex. 1008, 1–6. As stated in Viking, "[w]hen a fire occurs, the heat produced will operate a sprinkler causing the air pressure in the piping system to escape. When the pressure

trip-point is reached (directly or through the accelerator), the dry-pipe valve opens allowing water to flow through the system." Ex. 1008, 3.

Viking discloses "[t]he system piping from the Dry Pipe Valve to the fusible sprinklers is filled with *pressurized air or nitrogen*." Ex. 1008, 1 (emphasis added). Viking discloses a "[c]ompressed *air* supply (automatic or manual)" (*id.* (emphasis added)) but does not refer to a supply or source of pressurized nitrogen. It is clear however, that Viking discloses that pressurized nitrogen can be used as an alternative to pressurized air. When pressurized nitrogen is used, there must, of course, be a source of the pressurized nitrogen. Viking does not address why, or under what specific conditions, pressurized nitrogen would be used or preferred rather than pressurized air.

Viking refers to venting outlet pressure to the atmosphere, but only in the context of an optional "accelerator." Ex. 1008, 3, Sec. 4(B), ("On a pneumatic release system, the outlet pressure is vented to atmosphere, speeding the release system operation."). As explained in Viking, "[a] dry pipe valve equipped with an accelerator will trip more rapidly and at a higher air-pressure differential." Ex. 1008, 3, Sec. 4. An "accelerator" is disclosed in the '700 patent (*e.g.*, Ex. 1001 15:13–19) but is not claimed in the '700 patent.

The dry pipe system disclosed in Viking is substantially similar to the dry pipe system disclosed and claimed in the '700 patent. *See* Pet. 8–9; *see also* Dec. Reh'g. 7–10 (comparing figures and text in Viking and the '700 patent). The significant differences, as discussed below, are a specific recitation of a "nitrogen generator" and "vent" in the challenged claims.

*ii.     Wood (Ex. 1009)*

Wood discloses a condensate drain for a dry pipe sprinkler system. Ex. 1009, 1:10–12.  As disclosed in Wood, "[d]ry-pipe systems tend to collect condensate inside the piping system that must be periodically drained.  If the condensate is not drained, freezing temperatures will cause ice to form in the piping system, causing the pipe and pipe fittings to burst." *Id.* at 1:42–46.  Wood refers to a typical prior art two-valve, manually operated, condensate drain.  *Id.* at 1:49–53.  The manually operated, two-valve prior art condensate drain disclosed in Wood is referred to as a "two-valve drum drip" in Viking and is shown at reference numeral 24 in the figure on page 2 of Viking.  Ex. 1008, 2.

The Wood device improves on this *manually* operated prior art device by providing for the discharge of condensate *automatically*.  Ex. 1009, 1:59–60.  Automatic condensate drain 32, shown in Figure 2 of Wood, includes a pressure operated control valve 40.  *Id.* at 2:43–46.  Wood's automatic condensate drain is intended to automatically drain condensed water from piping systems, or other containers which normally are free of water and filled with pressurized air or gas.  *Id.* at 3:13–17.  In normal conditions, condensed water, *or air when water is not present*, is discharged through the discharge nozzle until the air pressure drops to a predetermined level. *Id.* at 3:17–19.  As explained in Wood, the basic purpose of condensate drain 32 is to eliminate "the need to manually drain small amounts of condensed water from piping systems or other containers."  *Id.* at 3:20–22.

The automatic condensate drain disclosed in Wood uses a pressure operated control valve to shut the device off if the air pressure drops below a desired limit.  When sufficient air pressure is restored to the system the

device will reset and automatically start operating.  Ex. 1009, 3:26–30; *see id.* at 3:42–58 (disclosing specific examples of the variable pressures at which Wood's condensate drain operates).  Petitioners acknowledge that there is no functional difference between Wood's condensate drain and a drum drip drain.  Tr. 13, ll. 1–3 ("I don't think there's a functional difference between Wood's drain and the drum drip drain."); *see also id.* at 18, ll. 18–25 (stating a typical drum drip drain "is functionally identical to Wood's – what Wood calls a condensate drain").

### iii.    *Wagner (Ex. 1010)*

Wagner discloses the use of oxygen sensors 7 to measure and control the oxygen level in a room for the purpose of fire suppression.  Ex. 1010, 12:4–12.  As disclosed in Wagner, in order to effectively reduce the risk of a fire developing in a protected area, the so-called "inert-gas technique" is applied to reduce the oxygen concentration by injecting into the protected area an inert gas, such as nitrogen.  *Id.* at 1:22–26.  Wagner refers to this technique as "permanent inertization of the protected area."  *Id.* at 1:33.  According to Wagner, "permanent inertization" effectively minimizes the risk of a fire developing in the protected area.  *Id.* at 1:33–37.  An inert gas generator and/or inert gas reservoir is provided for supplying an inert gas, for instance an air-nitrogen mixture.  To ensure the correct mixture, oxygen sensors and oxygen measuring units are used.  *Id.* at 12:1–12.

### b.  *Differences Between the Prior Art and the Challenged Claims*

The principal differences between the prior art and the challenged claims relate to the claimed nitrogen generator and the claimed vent.

In determining the differences between the prior art and the claims, the question under 35 U.S.C. § 103, however, is not whether the differences

themselves would have been obvious, but whether the claimed invention as a whole would have been obvious. *Litton Indus.*, 755 F.2d at 164 ("It is elementary that the claimed invention must be considered as a whole in deciding the question of obviousness."); *see also Stratoflex*, 713 F.2d at 1537 ("the question under 35 U.S.C. § 103 is not whether the differences themselves would have been obvious. Consideration of differences, like each of the findings set forth in *Graham*, is but an aid in reaching the ultimate determination of whether the claimed invention as a whole would have been obvious.").

### c. Level of Skill

Neither Petitioners nor Patent Owner proposes a level of skill in the relevant technology.

The level of skill in the art is "a prism or lens" through which we view the prior art and the claimed invention. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). The absence of an express finding about the level of skill in the art "does not give rise to reversible error 'where the prior art itself reflects an appropriate level and a need for testimony is not shown.'" *Id.* For purposes of this Decision we determine that the prior art itself reflects an appropriate skill level.

### d. Discussion – Claims 1, 2 and 5–9

Petitioners summarize in claim charts where the cited references disclose each element of the claims challenged. Pet. 13–18. Petitioners rely on AAPA for the recited nitrogen generator in claim 1. *Id.* at 10, 14. Petitioners rely on Wood for the recited "vent" in claim 1. *Id.* at 12, 15.

Patent Owner admits that Viking discloses the basic elements of a dry pipe sprinkler recited in the challenged claims. PO Resp. 3 ("Viking

discloses a dry pipe sprinkler system having, among other things, fusible sprinklers, a source of pressurized water, a piping network filled with pressurized air or nitrogen and pitched toward one or more drains including a drum drip, and a dry pipe valve having a clapper."). As of the filing date of the '700 patent, Patent Owner also admits that nitrogen generators had been used in the sprinkler industry. PO Resp. 14.

### i.  The Nitrogen Generator

Petitioners acknowledge that "[a]lthough the Viking reference teaches the use of compressed nitrogen to keep the dry pipe valve clapper closed until a fire opens a fusible sprinkler, it does not teach obtaining the nitrogen from a nitrogen generator." Pet. 9. Petitioners assert, correctly, that the '700 Specification discloses that nitrogen generators were well known and available commercially at the time the '700 patent application was filed. *Id.* (citing Ex. 1001, 10:55–62). The '700 Specification describes the general, basic function of a nitrogen generator: "[i]n the case of a dry pipe sprinkler system, the nitrogen generator may be used to purge or recharge the pressurized piping network with nitrogen." Ex. 1001, 10:63–65. This is similar to the basic function of the compressed air supply disclosed in Viking. *E.g.*, Ex. 1008, 3 ("Pressurize dry-pipe system with air pressure").

Petitioners assert correctly that Viking discloses the use of nitrogen as a pressurized gas in a dry pipe sprinkler system. Pet. 12; *see* Ex. 1008, 1 ("The system piping from the Dry Pipe Valve to the fusible sprinklers is filled with pressurized air or nitrogen."). Petitioners conclude that "[i]t would have been obvious to one of ordinary skill in the art at the time of filing the '700 patent application to modify Viking by adding a nitrogen generator, which the '700 patent specification admits is prior art." Pet. 12.

Patent Owner acknowledges that such generators were known and used in the sprinkler industry. PO Resp. 14; Tr. 36:1–9, 36:22–37:3.

We are persuaded, however, that the references themselves, Viking combined with AAPA, provide both the reason to use a nitrogen generator and the reason why it would have been obvious to do so. As stated in AAPA, there were a number of commercially available "suitable" nitrogen generators for supplying the pressurized nitrogen that Viking discloses is used in the Viking sprinkler system. Based on this evidence, we are persuaded that a person of ordinary skill and creativity would have chosen suitable equipment for the task at hand. *See also* Dec. Inst. 12–13 (concluding that use of a nitrogen generator in the Viking system "appears to be well within the skill and creativity of a person of ordinary skill").

## ii.   The Vent

In the Petition, Petitioners assert that Wood discloses the pressure-based, adjustable, "vent positioned within the piping network," as recited in claim 1 of the '700 patent. Pet. 11. Petitioners conclude that "[i]t would also have been *obvious to add a vent* operative to vent displaced oxygen while maintaining system pressure, as taught by Wood," to the modified Viking system discussed above. *Id.* at 12 (emphasis added).

Our Decision to Institute was based on our understanding of the evidence and arguments that because Viking disclosed a "vent" in the *optional* accelerator, it was reasonably likely that a person of ordinary skill would have considered it obvious also to use a vent in the basic fire protection system. Having considered the additional arguments and evidence submitted post-institution, we determine Petitioners assertion that

the challenged claims would have been obvious is not supported by a preponderance of the evidence.

An "accelerator" is an element used on the dry pipe valve, such as dry pipe valve 23 in the '136 patent, to allow the valve to open more quickly. *See* Ex. 1008, 3, Sec. 4. The dry pipe valve controls the flow of pressurized water into the distribution piping. The faster the dry pipe valve opens, the faster water flows through the pipes and out the sprinklers. The "accelerator" disclosed in Viking is a "pneumatic release system," where outlet pressure is vented to the atmosphere, allowing the dry pipe valve to open more quickly. *Id.* at 3, Sec. 4(B). As explained in Viking, "[a] dry pipe valve equipped with an accelerator will trip more rapidly and at a higher air-pressure differential." *Id.* at 3, Sec. 4; *see also* Dec. Inst. 11 (referring to Viking's disclosure that if an accelerator is used, it may be necessary to loosen the air gauge to vent trapped air pressure (citing Ex. 1008, 3)). We are persuaded, based on the record as a whole including Viking and the Declaration testimony of Mr. O'Neill (Ex. 2019, ¶¶ 59–61), that Viking does not suggest the use of a vent operable to allow gas to exit the piping network at a preset or adjustable limit while maintaining enough pressure within the system *to prevent the clapper of the dry pipe valve from opening*, as required by claim 1. Indeed, the vent disclosed in Viking *accelerates* opening of the dry pipe valve.

We also have been provided further evidence, such as Mr. O'Neill's Declaration testimony (Ex. 2019) opining on the Wood disclosure from the perspective of a person of ordinary skill in the art. Accordingly, we have modified our analysis of Wood based on the complete record. In the Decision to Institute, we considered Wood's condensate drain to be a "vent."

*E.g.*, Dec. Inst. 13. As explained above, considering the complete record, including the testimony of Mr. O'Neill (Ex. 2019 ¶¶ 55–58), we determine that Wood's automatic condensate drain is intended to drain condensed water from piping systems. Ex. 1009, 3:13–23. The disclosure that Wood's drain will exhaust air when water is not present (*Id.* at 3:17–19) does not establish that Wood's drain is a vent operable to allow gas to exit the piping network at a preset or adjustable limit while maintaining enough pressure within the system to prevent the clapper of the dry pipe valve from opening, as required by claim 1.

The proposed combination, as asserted in the Petition, adds a new component to Viking. Petitioners did not assert in the Petition that Wood's automatic condensate drain would replace the manual condensate drain, or drum drip 24, in Viking, or any other drain in Viking. Thus, Petitioners' proposed modification results in two condensate drains in Viking, one a manual drain (drum drip 24) and one an automatic drain, without a persuasive explanation as to why a person of ordinary skill would make this change.

Patent Owner argues "Wood lacks any suggestion of repurposing the automatic condensate drain device as a gas vent, to vent gas from a system rather than drain fluids." PO Resp. 7. Patent Owner also asserts, correctly, that in the Petition, "Petitioners' assertion that it would have been obvious to use Wood's automatic condensate drain device, as a gas vent rather than a condensate drain, in Viking's dry pipe system is supported only by conclusory statements and arguments of counsel." PO Resp. 28.

Petitioners offer no persuasive evidence that Wood's condensate drain is operable to allow gas to exit the piping network at a preset or adjustable

limit while maintaining enough pressure within the system to prevent the clapper of the dry pipe valve from opening, as required by claim 1. In their Reply, Petitioners rely on the testimony of Mr. Friesen to establish that Wood's condensate drain "vents water <u>and gas</u>." Reply 8 (citing Ex. 1013 ¶ 17). Mr. Friesen fails to address, however, that Wood discloses that its fundamental objective is to drain condensed water. *See* Ex. 1009, 3:20–22. Wood discloses that air is discharged only "when water is not present." *Id.* In the challenged claims, the claimed "drum drip" functions to drain condensed water. The claimed vent functions to balance pressures. There is no persuasive evidence that the incidental escape of air from the Wood drain balances pressures as required by the vent in claim 1.

Mr. Friesen also does not support his stated opinion in paragraph 17 of his Declaration with the underlying facts or data on which the opinion is based. Conclusory opinions are entitled to little or no weight. 37 C.F.R. § 42.65.

What also is missing from Petitioners' analysis is persuasive evidence establishing "why" a person of ordinary skill would have *added* the automatic condensate drain of Wood to the Viking system to obtain the vent recited in claim 1. Claim 1 recites both a vent and a condensate drain (drum drip). As explained above, Wood eliminates the need to manually drain small amounts of condensed water from piping systems or other containers. Ex. 1009, 3:20–22. Thus, using Wood in the Viking system may eliminate the need for drum drip 24 in Viking. It does not add a vent operable to allow gas displaced by the nitrogen to exit the piping network at a preset or adjustable limit *while maintaining enough pressure within the system to prevent the clapper of the dry pipe valve from opening*, as recited in claim 1.

Wood discloses that some pressurized gas may escape the system, but any such escaping gas is incidental to the objective of Wood, which is to drain condensed water from the piping system. There is no disclosure or suggestion in Wood that condensate drain 32 regulates the pressure of gas in the piping system. Petitioners assert that the claimed pressure regulation of the vent would be inherent in the proposed combination (Pet. 12), but provide no persuasive evidence to support this argument.

In determining whether there would have been a motivation to combine prior art references to arrive at the claimed invention, it is insufficient to simply conclude the combination would have been obvious without identifying any reason why a person of skill in the art would have made the combination. *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1366 (Fed. Cir. 2017). Petitioners provide no explanation or reasoning for concluding that one of skill in the art would have combined these particular references to produce the claimed invention.

In their Reply, Petitioners state that adding Wood's condensate drain to Viking's system would have been "common sense." Reply 7. "Common sense" is a conclusory label. It is the final step in a reasoned analysis based on the evidence. References to "common sense"—whether to supply a motivation to combine or a missing limitation—cannot be used as a wholesale substitute for reasoned analysis and evidentiary support, especially when dealing with a limitation missing from the prior art references specified. *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1362 (Fed. Cir. 2016), *cert. denied sub nom. Google Inc. v. Arendi S. A. R. L.*, No. 16-626, 2017 WL 1040877 (U.S. Mar. 20, 2017). Petitioners' failure to explain the "common sense" on which it relied is problematic. *Id.*

In general, taken out of a specific context, providing a "vent" in the Viking system may seem like a simple, common sense modification that would have been obvious to a person of ordinary skill and creativity. We do not abandon our common sense in considering obviousness of claimed inventions. *KSR*, 550 U.S. at 421. Our decision is based on the evidence and arguments before us. The evidence on which Petitioners rely does not disclose or suggest the "vent" as recited in the challenged claims.

In the highly developed field of sprinkler systems, small differences may produce a nonobvious advance. *See Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1298 (Fed. Cir. 2012); *see also Unigene Labs., Inc. v. Apotex, Inc.,* 655 F.3d 1352, 1360–61 (Fed.Cir.2011) (providing that the inquiry under § 103 is not whether the claimed invention is "sufficiently simple to appear obvious to judges after the discovery is finally made"). "The emphasis on nonobviousness is one of inquiry, not quality" of the advance. *Graham*, 383 U.S. at 17.

While "the common sense of those skilled in the art demonstrates why some combinations would have been obvious where others would not," (*Leapfrog Enters., Inc. v. Fisher–Price, Inc.*, 485 F.3d 1157, 1161 (Fed. Cir. 2007)), the determination is made not after observing what the inventor actually did, but in light of the state of the art before the invention was made. *Outside the Box Innovations*, 695 F.3d at 1298.

In its Reply, Petitioners assert a new motivation. Petitioners assert that a person of ordinary skill would "substitute" Wood's drain for one of the drains in Viking. Reply 11–15. We find this new argument and the evidence on which it relies equally unpersuasive for the same reasons as stated above, i.e., it does not explain why a person of ordinary skill in the art

would have substituted Wood's condensate drain for any one of the various drains in Viking, which include test drain 6, water motor alarm drain 10, drum drip 24, and Inspector's test drain 29. As we explained above, even if such a substitution were made, the resulting structure would not serve as the claimed "vent," operable to allow gas to exit the piping network at a preset or adjustable limit while maintaining enough pressure within the system to prevent the clapper of the dry pipe valve from opening, as required by claim 1.

### 2. Conclusion Regarding Claims 1, 2 and 5–9
### Obviousness Based on Viking, Wood, and AAPA

Based on the evidence and the analysis above, we determine that Petitioners have failed to carry their burden to establish unpatentability of claims 1, 2, and 5–9 by a preponderance of the evidence.

### 3. Claims 3 and 4
### Obviousness Based on Viking, Wood, AAPA, and Wagner

Petitioners also provide summary claim charts for their asserted Ground 2, challenging claims 3–4. *Id.* at 19–20. Claim 3 depends from claim 1 and recites an oxygen sensor coupled to the dry pipe sprinkler system. Claim 4 depends from claim 3 and recites that the nitrogen generator is configured to provide nitrogen to the piping network automatically in response to an oxygen level measured by the oxygen sensor. Petitioners assert that Wagner teaches the use of an oxygen sensor in conjunction with a nitrogen generator to measure and control the oxygen level in a room for the purpose of fire suppression. *Id.* at 18.

Wagner fails to cure the deficiencies of the prior art identified above with respect to independent claim 1. Accordingly, Petitioners have failed to

carry their burden to establish unpatentability of claims 3 and 4 by a preponderance of the evidence.

## III. CONCLUSION

Based on the analysis above, we determine that Petitioners have not established by a preponderance of the evidence that claims 1–9 of the '700 patent would have been obvious based on the cited references. Based on this determination, we need not address the objective evidence in support of patentability on which Patent Owner relies.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Petitioner has not established that claims 1–9 are unpatentable; and

FURTHER ORDERED that this is a Final Written Decision under 35 U.S.C. § 318(a), and that parties to the proceeding seeking judicial review of the decision under 35 U.S.C. § 319 must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONERS:

Edward H. Green, III
egreen@coatsandbennett.com

David E. Bennett
dbennett@coatsandbennett.com

PATENT OWNER:

MICHAEL J. THOMAS,
mthomas@hdp.com

BRYAN K. WHEELOCK,
bwheelock@hdp.com

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

SOUTH-TEK SYSTEMS, LLC AND POTTER ELECTRIC CO, LLC,
Petitioners,

v.

ENGINEERED CORROSION SOLUTIONS, LLC,
Patent Owner.
_____

IPR2016-00136
Patent 9,144,700 B2
_____

Before WILLIAM V. SAINDON, BARRY L. GROSSMAN, and
JEREMY M. PLENZLER, *Administrative Patent Judges.*

GROSSMAN, *Administrative Patent Judge.*

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

# I. INTRODUCTN

## *A. Background*

South-Tek Systems, LLC and Potter Electric Co, LLC ("Petitioners") filed a Petition requesting *inter partes* review of claims 1–9 of U.S. Patent No. 8,474,700 (Ex. 1001, "the '700 patent") pursuant to 35 U.S.C. §§ 311–319. Paper 3 ("Pet."). Engineered Corrosion Solutions, LLC ("Patent Owner") filed a Preliminary Response to the Petition. Paper 7 ("Prelim. Resp.").

We have jurisdiction under 35 U.S.C. § 314(a) and 37 C.F.R. § 42.4(a). Pursuant to § 314(a) an *inter partes* review may not be instituted "unless . . . the information presented in the petition . . . shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least one of the claims challenged in the petition." "The 'reasonable likelihood' standard is a somewhat flexible standard that allows the Board room to exercise judgment." Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,765 (Aug. 14, 2012).

For the reasons described below, we determine that Petitioners demonstrate that there is a reasonable likelihood that they would prevail with respect to at least one of the challenged claims. Accordingly, we institute an *inter partes* review of claims 1–9.

## *B. Related Proceedings*

Petitioners state they "are not aware of any other judicial or administrative matter that would affect, or be affected by, a decision" in this proceeding. Pet. 4.

Patent Owner states "[t]his *inter partes* review may affect or be affected by" U.S. Patent No. Patent No. 9,186,533 and four pending patent applications. Paper 6, 2.

### C. The '700 Patent

The '700 patent discloses a fire protection system that uses a nitrogen generator coupled to sprinklers to reduce corrosion in the system. Oxygen dissolved in water or otherwise present within the fire protection system is displaced with nitrogen from the nitrogen generator in order to reduce or eliminate effects of oxidative corrosion of ferrous and cuprous components and to deprive aerobic microbiological organisms the opportunity to grow within the system. The patent discloses both "dry pipe" and "wet pipe" systems. The '700 patent discloses that a "dry pipe" sprinkler system is a fire-protection system that utilizes water as an extinguishing agent. The Specification states that a dry pipe system is used primarily to protect unheated structures or areas where the system is subject to freezing temperatures. The Specification also states that in conventional dry pipe sprinkler systems, pools of residual water often are left from initial hydrostatic testing, from periodic flow testing, or from condensation of moist air that is used to maintain system pressure. According to the Specification, known dry pipe systems use nitrogen to fill the piping void space to pressurize the piping and to mitigate the corrosion of the ferrous and cuprous metal components.

The disclosed dry pipe system is illustrate in Figure 1 of the '700 patent, reproduced below.



Fig. 1

In operation, a dry pipe sprinkler system may be configured to continuously supply pressurized nitrogen into a piping network using nitrogen generator 25. The nitrogen generator provides a steady stream of pressurized nitrogen into the sprinkler system to keep dry pipe valve 23 closed. To prevent over-pressurization, the system may include a vent, such as a relief valve, in order to control or limit the pressure in the system. The relief valve allows pressurized nitrogen to escape at a preset or adjustable limit to prevent over-pressurization while maintaining enough pressure within the system to prevent the dry pipe valve from opening. Drum drip 39 and drain valve and plug 41 are positioned in the piping network. In the event the fire protection system is actuated, due to a fire or for testing, the pressure within the piping network is lost faster than the nitrogen generator can replace it, even when continuously applying pressurized nitrogen, thereby allowing the dry pipe valve to open and pressurized water to enter the piping network and exit through sprinklers 43, 45.

The '700 patent also discloses a wet pipe sprinkler system, which it states is used in structures not subject to freezing. The claims of the patent, however, specifically recite a "dry pipe sprinkler system."

*D. Illustrative Claim*

The sole independent claim, claim 1, reproduced below, is illustrative of the claims in the '700 patent.

1. A water-based fire protection system comprising:

a dry pipe sprinkler system comprising at least one fusible sprinkler, a source of pressurized water, a piping network connected to the at least one fusible sprinkler, one or more drains, and a dry pipe valve coupling the source of pressurized water to the piping network, the dry pipe valve having a clapper, the piping network pitched toward the one or more drains, and the one or more drains including a drum drip;

a nitrogen generator coupled to the piping network, the nitrogen generator operable to pressurize the piping network with nitrogen and maintain the clapper of the dry pipe valve in a closed position until the water-based fire protection system is actuated; and

at least one vent positioned within the piping network, the at least one vent operable to allow gas including oxygen displaced by the nitrogen to exit the piping network at a preset or adjustable limit while maintaining enough pressure within the system to prevent the clapper of the dry pipe valve from opening until the water-based fire protection system is actuated to thereby increase the concentration of nitrogen and decrease the concentration of oxygen in the piping network to reduce or eliminate the rate of corrosion in the piping network.

*E. Asserted Grounds of Unpatentability*

Petitioners asserts the following grounds of unpatentability:

| Ground | Claims | Prior Art |
|---|---|---|
| § 103 | 1, 2, and 5–9 | Viking[1], Wood[2], and AAPA[3] |
| § 103 | 3, 4 | Viking, Wood, AAPA and Wagner[4] |
| § 103 | 1, 2, and 5–9 | Wood, Ringer[5] and AAPA |
| § 103 | 3, 4 | Wood, Ringer, AAPA, and Wagner |

## II. ANALYSIS

*A. Claim Construction*

When interpreting a claim, words of the claim are generally given their ordinary and accustomed meaning, unless it appears from the specification, the file history, or other evidence asserted by the parties that the inventor used them differently. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Any special definition for a claim term must be set forth in the specification with reasonable clarity, deliberateness, and precision. *Id.* Only terms which are in controversy need to be construed, and then only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

---

[1] Viking Corp. Technical Data, Dry Pipe Sprinkler System (dated Mar. 2, 2007) (Ex. 1008).
[2] U.S. Patent No. 6,540,028 (issued Apr. 1, 2003) (Ex. 1009).
[3] Applicant Admitted Prior Art.
[4] U.S. Patent No. 7,717,776 (issued May 18, 2010) (Ex. 1010).
[5] U.S. Patent No. 7,322,423 (issued Jan. 29, 2008) (Ex. 1011).

Petitioners propose a construction for the phrase "drum drip." Pet. 6–7. Patent Owner disagrees with Petitioners' proposed construction and notes that the phrase "drum drip" is a well-known term of art. Prelim. Resp. 3. We determine that an explicit construction of "drum drip" or any other claim term is not necessary for the purposes of our Decision.

### B. Ground of Unpatentability

#### 1. Scope and Content of the Prior Art; Differences Between the Prior Art and the Challenged Claims

##### a. Viking

Viking is a six page document titled "[T]echnical Data [–] 'Dry Pipe Sprinkler System.'" According to Petitioners,

> Figure 1 of the '700 patent specification as filed is virtually identical to the figure at p. 2 of the Viking reference, with only three differences: the applicants added a nitrogen generator 25 and an oxygen sensor 51, and numbered the parts differently1 (although the names of all parts in Fig.1, listed at col. 15, line 61 – col. 16, line 25 of the '700 patent specification, are identical to their labels in the Viking reference). Indeed, the '700 patent specification's description of dry pipe sprinkler systems – spanning col. 13, line 53 – col. 14, line 3; col. 14, lines 11-64; and col. 15, lines 13-60, and including over 1,000 words – is virtually word-for-word identical to the description in the Viking reference, with the word "nitrogen" being substituted for "air" in numerous instances.

*Id.* at 8–9.

Viking discloses "[t]he system piping from the Dry Pipe Valve to the fusible sprinklers is filled with pressurized air or nitrogen." Ex. 1008, 1. Viking discloses a "[c]ompressed air supply (automatic or manual)" (*id.*) but does not refer to a supply or source of pressurized nitrogen. It is clear however, that Viking discloses that pressurized nitrogen can be used as an

alternative to pressurized air. When pressurized nitrogen is used, there must, of course, be a source of the pressurized nitrogen.

Petitioners acknowledge that "[a]lthough the Viking reference teaches the use of compressed nitrogen to keep the dry pipe valve clapper closed until a fire opens a fusible sprinkler, it does not teach obtaining the nitrogen from a nitrogen generator." *Id.* at 9. Petitioners assert, correctly, that the '700 Specification discloses that nitrogen generators were well known in the art at the time the '700 patent application was filed. *Id.* (citing Ex. 1001, col. 10, lines 55–62). The '700 Specification describes the general, basic function of a nitrogen generator: "[i]n the case of a dry pipe sprinkler system, the nitrogen generator may be used to purge or recharge the pressurized piping network with nitrogen." Ex. 1001, 10:63–65. This is similar to the basic function of the compressed air supply disclosed in Viking. *E.g.*, Ex. 1008, 3 ("Pressurize dry-pipe system with air pressure").

Petitioners conclude that based on Viking and the AAPA of a nitrogen generator "[i]t would have been obvious, at the time of filing the '700 patent application, to use a nitrogen generator to generate the nitrogen gas for use in a dry pipe sprinkler system, as taught by Viking." *Id.* at 10.

### b. Wood (Ex. 1009)

According to Petitioners, Wood discloses a condensate drain that automatically opens to disgorge accumulated water and debris. The drain valve is held shut by a spring having an adjustable force. The spring force is set to be within the range of minimum and maximum piping pressures that trigger an air compressor to operate. Pet. 10. Petitioners conclude that Wood discloses the pressure-based, adjustable, "vent positioned within the piping network," as recited in claim 1 of the '700 patent. *Id.* at 10.

Petitioners conclude that "[i]t would also have been obvious to add a vent operative to vent displaced oxygen while maintaining system pressure, as taught by Wood," to the modified Viking system discussed above. *Id.* at 12.

### c. Wagner (Ex. 1010)

Regarding claims 3 and 4 in Petitioners' asserted Ground 2, Petitioners assert Wagner teaches the use of an oxygen sensor in conjunction with a nitrogen generator to measure and control the oxygen level in a room for the purpose of fire suppression. Pet. 18. Petitioners conclude, that "[i]t would have been obvious to one of ordinary skill in the art, at the time of filing the '700 patent application, to modify the teachings of Viking, AAPA, and Wood by Wagner's teaching to add an oxygen sensor, and control the nitrogen generator based on the oxygen level measured by the oxygen sensor." *Id.* at 19.

### 2. Level of Skill

Neither Petitioners nor Patent Owner propose a level of skill in the relevant technology.

The level of skill in the art is "a prism or lens" through which we view the prior art and the claimed invention. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). The absence of an express finding about the level of skill in the art "does not give rise to reversible error 'where the prior art itself reflects an appropriate level and a need for testimony is not shown.'" *Id*. For purposes of this Decision we determine that the prior art itself reflects an appropriate skill level.

*3. Ground 1 - Claims 1, 2 and 5–9
Obviousness Based on Viking, Wood, and AAPA*

Patent Owner asserts "Petitioners challenge the examiners' conclusions with mere attorney argument, premised on several false or misleading statements, and unsupported by any expert declaration or other evidence." Prelim. Resp. 1. Patent Owner states the "core issue" is "whether it would have been obvious to: (a) use Wood's automatic condensate drain device 32 in (b) a dry pipe sprinkler system pressurized with nitrogen from a nitrogen generator." *Id.*

Petitioners bear the burden of establishing a reasonable likelihood of unpatentability of one or more claims. 37 C.F.R. § 42.108(c).

Petitioners summarize in claim charts where the cited references disclose each element of the claims challenged. Pet. 13–18. Petitioners conclude their argument concerning their asserted Ground 1 with the following statement:

> Viking teaches all claimed dry pipe sprinkler system components. Viking teaches the use of nitrogen as a pressurized gas in a dry pipe sprinkler system. It would have been obvious to one of ordinary skill in the art at the time of filing the '700 patent application to modify Viking by adding a nitrogen generator, which the '700 patent specification admits is prior art. It would also have been obvious to add a vent operative to vent displaced oxygen while maintaining system pressure, as taught by Wood. In such a system, it is inherent that continuously inputting high-purity nitrogen gas while venting ambient gas in the pipes will increase the concentration of nitrogen. It is a well-known property of nitrogen gas that it inhibits corrosion due to the lack of oxygen. "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."

*Id.* at 12.

Patent Owner argues "[w]hat is missing from Petitioners' argument is an explanation regarding why it would have been obvious to add (a) Wood's automatic condensate drain device 32 to (b) [Viking's] dry pipe sprinkler system pressurized with nitrogen from a nitrogen generator."  Prelim. Resp. 25.

Petitioners rely on Wood for the recited "vent" in claim 1.  Pet. 15. The recited purpose of the vent in claim 1 is "to allow gas including oxygen displaced by the nitrogen to exit the piping network at a preset or adjustable limit while maintaining enough pressure within the system to prevent the clapper of the dry pipe valve from opening until the water-based fire protection system is actuated."  Ex. 1001, 18:28–34.

Viking clearly discloses the use of pressurized air or nitrogen in its system.  Viking also points out that "all dry pipe systems function in the same manner," which is to maintain the pressurized system as closed and ready to operate until a water supply is needed to extinguish a fire. Additionally, Viking discloses the need to vent its system.  For example, when setting the system, Viking discloses the need to vent water and pressurized gas from its system.  Ex. 1008, 3 ("It may be necessary to loosen the air gauge to vent the trapped air pressure in the upper chamber").

Patent Owner points out that Petitioners do not rely on testimonial evidence from an expert.  *E.g.*, Prelim. Resp. 26 ("Petitioners do not even attempt to provide new information or an explanation supported by expert testimony").  It is well-established that, where the technology involved is easily understandable, as here, expert testimony to establish what would have been obvious is not required.  *Wyers v. Master Lock Co.,* 616 F.3d 1231, 1242 (Fed.Cir.2010); *see also Centricut, LLC v. Esab*

*Group, Inc.,* 390 F.3d 1361, 1369 (Fed.Cir.2004) ("In many patent cases expert testimony will not be necessary because the technology will be 'easily understandable without the need for expert explanatory testimony.'" (citation omitted)).  As stated in *Wyers*, "*KSR* and our later cases establish that the legal determination of obviousness may include recourse to logic, judgment, and common sense, in lieu of expert testimony."  616 F.3d 1239.

As the Supreme Court informs us, "[o]ften, it will be necessary for a court to look to . . . the background knowledge possessed by a person having ordinary skill in the art, [ ] in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR Int'l v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). [T]he [obvious] analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Id.* (*citing In re Kahn,* 441 F.3d 977, 988 (Fed. Cir. 2006). We do so here, noting that "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *Id.* at 421.

The issue here is whether a dry pipe sprinkler system designer of ordinary skill, facing the wide range of needs created by developments in the relevant technology, would have seen a benefit to adding a nitrogen generator and vent, as recited in claim 1, to Viking based on the additional references.  Based on the record before us, for purposes of this Decision, we are persuaded that the answer to this question is yes.  Viking discloses using pressurized air *or nitrogen*.  Viking does not explicitly state the source of the pressurized medium.  Nitrogen generators admittedly were well-known. Using such a generator in the Viking system appears to be well within the

skill and creativity of a person of ordinary skill.  We also determine that the record before us supports Petitioners' position that it would have been obvious to use a vent, such as disclosed in Wood, to accomplish the venting that "may be necessary," as stated in Viking.

Patent Owner also argues "Ground 1 should be denied as duplicative of arguments previously considered by the Office. 35 U.S.C. § 325(d)." Prelim. Resp. 21.  We disagree.  Viking was neither disclosed to the PTO during prosecution, cited in the record, or applied by the Examiner.  As pointed out by Petitioners, there is a substantial similarity between Figure 1 of the '700 patent and portions of its Specification and the disclosure of Viking.  Pet. 8–9 ("Figure 1 of the '700 patent specification as filed is virtually identical to the figure at p. 2 of the Viking reference").  Patent Owner argues that "Petitioners fail to present any evidence regarding why the [Viking] Datasheet is more relevant than the art previously considered by the Office."  Prelim. Resp. 23.  Again, we disagree.  First, there is no requirement that Petitioners need to show Viking to be "more relevant than the art previously considered by the Office."  Second, the substantial similarities between Viking and the disclosed invention discussed above; the specific disclosure in Viking of using pressurized nitrogen; the specific disclosure in Viking of a drum drip valve; and the specific disclosure of the need to vent the Viking system all make Viking a very relevant reference. The fact that other references relied on by Petitioners were cited during prosecution does not establish that the asserted Ground 1 is duplicative of the prior proceedings before the PTO.

*4. Ground 2 - Claims 3 and 4*
*Obviousness Based on Viking, Wood, AAPA, and Wagner*

Petitioners also provide summary claim charts for their asserted Ground 2, challenging claims 3–4. *Id.* at 19–20. Claim 3 depends from claim 1 and recites an oxygen sensor coupled to the dry pipe sprinkler system. Claim 4 depends from claim 3 and recites that the nitrogen generator is configured to provide nitrogen to the piping network automatically in response to an oxygen level measured by the oxygen sensor. Petitioners assert, consistent with the Examiner's determination during prosecution, that Wagner teaches the use of an oxygen sensor in conjunction with a nitrogen generator to measure and control the oxygen level in a room for the purpose of fire suppression. *Id.* at 18. Petitioners conclude that it would have been obvious to one of ordinary skill in the art, at the time of filing the '700 patent application, to modify the teachings of Viking, AAPA, and Wood by Wagner's teaching to add an oxygen sensor, and control the nitrogen generator based on the oxygen level measured by the oxygen sensor. *Id.* at 19.

Patent Owner repeats its arguments against independent claim 1 for the asserted grounds of unpatentability against claims 3 and 4. Prelim. Resp. 27.

Based on our analysis above, we are persuaded, for purposes of this Decision, that Petitioners have established a reasonable likelihood of prevailing on claims 3 and 4.

*5. Grounds 3 and 4*
*Obviousness Based on Wood, Ringer, AAPA, and Wagner*

Petitioners acknowledge that asserted Grounds 3 and 4 are identical to a rejection made by the Examiner during prosecution of the application that

matured into the '700 patent.  Pet. 6.  Petitioners rely on selected excerpts

from the prosecution history to conclude that the limitations in the issued

claims are disclosed in the cited references.  *Id.* at 24.  Petitioners also assert

that a "drum drip," added by amendment, was not searched by the Examiner.

*Id.* at 26.  Petitioners speculate that *if* the Examiner had searched for a "drum

drip" the Examiner "would have found and cited" Loiacono,[6] which defines

a "drum drip."  Petitioners assert that:

> "drum drips" are "substantially vertical pipes connected to the
> overhead piping and positioned such that residual [water] and
> condensate in the pipes will drain into the drum drips which are
> fitted with gate valves at their lower ends.  Periodically, the gate
> valves are opened and accumulated water and condensate may
> be removed."

*Id.* at 27 (citing Ex. 1012, col. 1, lines 45-54).  Petitioners conclude from this

specific description that a drum drip simply is a "condensate drain."  *Id.*

Petitioners do not cite any persuasive evidence to support their position that

all condensate drains take the form of drum drips.  Continuing down this

speculative path, Petitioners assert that Wood discloses a condensate drain

and "*inherently* discloses a drum drip."  *Id.*  Petitioners do not cite any

persuasive evidence to support that position.  Petitioners conclude that the

amendment adding a drum drip "was insufficient to clear the obviousness

bar" and the amended claims "should not have been allowed" to issue.  *Id.*

Patent Owner argues that Petitioners' analysis is "fatally flawed."

Prelim. Resp. 32.  Patent Owner argues that the Examiner "*explicitly* relied

on Wood's automatic condensate drain device 32 as satisfying the claimed

vent," not a drum drip.  *Id.* at 33 (citations omitted).  Patent Owner also

---

[6] U.S. Patent No. 4,849,739, issued July 18, 1989 (Ex. 1012).

asserts that the Examiner did, in fact, search for "drum drips" and found seventy-five references that included this term. *Id.* at 34 (citing Ex. 2011). The record before us supports Patent Owner's position.

Grounds 3 and 4 rely on Ringer rather than Viking, but otherwise are substantially similar to Petitioners' Grounds 1 and 2. Here, we agree with the Examiner's determination that the cited references do not disclose the elements recited in independent claim 1. Specifically, we agree that Wood does not inherently disclose a drum drip. Accordingly, we decline to institute a trial on Petitioners' Grounds 3 and 4.

## III. CONCLUSION

Based on the analysis above, we determine that Petitioners have demonstrated a reasonable likelihood of prevailing on at least one of the challenged claims based on Viking, Wood, AAPA, and Wagner. We also determine that Petitioners have *not* demonstrated a reasonable likelihood of prevailing on at least one of the challenged claims based on Ringer, Wood, AAPA, and Wagner.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that *inter partes* review is instituted as to whether claims 1, 2, and 5–9 of the '700 patent would have been obvious under 35 U.S.C. § 103 in view of Viking, AAPA, and Wood;

FURTHER ORDERED that *inter partes* review is instituted as to whether claims 3 and 4 of the '700 patent would have been obvious under 35 U.S.C. § 103 in view of Viking, AAPA, Wood, and Wagner;

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(a), *inter partes* review of the '700 patent is hereby instituted commencing on the

entry date of this Order, and pursuant to 35 U.S.C. § 314(c) and 37 C.F.R.

§ 42.4, notice is hereby given of the institution of a trial; and

FURTHER ORDERED that no ground other than that specifically

instituted above is authorized for the *inter partes* review.

PETITIONERS:

Edward H. Green, III
egreen@coatsandbennett.com

David E. Bennett
dbennett@coatsandbennett.com

PATENT OWNER:

Michael J. Thomas
MJTEFILE@HDP.COM

Bryan K. Wheelock
BWHEELOCK@HDP.COM

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

SOUTH-TEK SYSTEMS, LLC AND POTTER ELECTRIC CO, LLC,
Petitioner,

v.

ENGINEERED CORROSION SOLUTIONS, LLC,
Patent Owner.

_____

Case IPR2016-00136
Patent 9,144,700 B2

_____

Before WILLIAM V. SAINDON, BARRY L. GROSSMAN, and
JEREMY M. PLENZLER, *Administrative Patent Judges*.

GROSSMAN, *Administrative Patent Judge*.

ORDER
Denying Petitioner's Motion to File Supplemental Information
*37 C.F.R. § 42.123(a)*

## I.  INTRODUCTION

We authorized Petitioner to submit a motion to file supplemental information ("Motion") in accordance with 37 C.F.R. § 42.123(a).  Paper 12. Petitioner filed its Motion (Paper 14) and Patent Owner filed its Opposition to the Motion (Paper 21).  Petitioner's Motion seeks to file as supplemental information five exhibits.  Petitioner asserts that four of the proposed exhibits, Exhibits A–D, each are "relevant to construing the undefined claim term 'drum drip.'"  Motion 1.  Petitioner asserts that proposed Exhibit E "is relevant to the motivation to combine the Wood and Viking references."  *Id.*

Based on the analysis below, we deny Petitioner's Motion.

### A.  THE '700 PATENT

The challenged claims are directed to a water-based fire protection system.  Ex. 1001, 18:14[1].  The challenged claims use the terms "drum drip" and "vent."  *E.g.*, Ex. 1001, 18:22, 28.

#### 1.  "DRUM DRIP"

Independent claim 1, the sole independent claim among the challenged claims, recites "one or more drains including a drum drip."  Ex. 1001, 18:21–22.  The Specification states "[a] drain is provided at all low points.   A two-valve drum drip may be required."  *Id.* at 14:59–60.  The Specification also discloses "[a] drum drip 39 and drain valve and plug 41 are positioned in the piping network."  *Id.* at 16:14–15; Fig. 1.  The three passages quoted above are the only places the phrase "drum drip" appears in the '700 patent.

---

[1] Cites to the '700 patent are in the format of "column:line."

2. "VENT"

Independent claim 1 recites "at least one vent positioned within the piping network, the at least one vent operable to allow gas including oxygen displaced by the nitrogen to exit the piping network." Ex. 1001, 18:28–30. The Specification discloses "[c]ontinuous venting of the fire protection system using one or more vents or valves facilitates removal of any oxygen within the system while maintaining the required system pressure (of nitrogen) for the fire sprinkler system." *Id.* at 11:29–32.

### B. THE DECISION TO INSTITUTE

Our Decision to Institute (Paper 8, "DI"), instituted an *inter partes* review of all nine claims of the '700 patent. The DI instituted review based on Petitioner's asserted Ground 1 under 35 U.S.C. § 103 in view of Viking, the patent applicant's admitted prior art ("AAPA"), and Wood. DI 16. It also instituted review based on Petitioner's asserted Ground 2 of claims 3 and 4 under 35 U.S.C. § 103 in view of Viking, AAPA, Wood, and Wagner. *Id.* As stated in the Decision to Institute, Petitioner relied on Viking for the disclosure of "all claimed dry pipe sprinkler system components," and relied on Wood for "a vent operative to vent displaced oxygen while maintaining system pressure." *Id.* at 10 (citing Petition 12).

Petitioner proposed a construction for the phrase "drum drip." Pet. 6–7. Patent Owner asserted that the phrase "drum drip" is a well-known term of art. Prelim. Resp. 3. We determined that an explicit construction of "drum drip" was not necessary for the purposes of our Decision. DI 7. We also determined that Viking disclosed a drum drip. DI 13 (". . . the specific disclosure in Viking of a drum drip valve"); *see also*, Ex. 1008, 2 ("All

piping must be pitched toward a drain. A drain must be provided at all low points. A two-valve drum drip may be required.").

Petitioner relied on Wood for the recited "vent" in claim 1. DI 11 (citing Pet. 15). We determined, for purposes of the Decision to Institute, it was reasonably likely that Petitioner would prevail in establishing that it would have been obvious to use a vent, such as disclosed in Wood, to accomplish the venting that "may be necessary," as stated in Viking. *Id.* at 13.

The Decision to Institute denied *inter partes* review of Petitioner's asserted Ground 3, based on Wood, Ringer and AAPA, and on asserted Ground 4, based on Wood, Ringer, AAPA, and Wagner. DI 14–16. These asserted Grounds were identical to a rejection made by the Examiner. *Id.* at 14. Petitioner's argument regarding its asserted Grounds 3 and 4 was that Wood discloses a condensate drain and "*inherently* discloses a drum drip." *Id.* at 15 (citing Pet. 27). Petitioner did not request rehearing of the determinations denying trial on Grounds 3 and 4. *See* 37 C.F.R. § 42.71(d)(1).

Petitioner's Motion to File Supplemental Information is not a substitute or alternative to a request for rehearing. The supplemental information Petitioner seeks to submit does not change the grounds of unpatentability authorized in this proceeding, nor does it change the evidence initially presented in the Petition to support those grounds of unpatentability. *See Palo Alto Networks, Inc. v. Juniper Network, Inc.,* IPR2013–00369, Paper 37, 3 (P.T.A.B. Feb. 5, 2014).

## II.   ANALYSIS

As the moving party, Petitioner bears the burden of proving that it is entitled to the requested relief.  37 C.F.R. § 42.20(c).  Under 37 C.F.R. § 42.123(a), a party may file a motion to submit supplemental information if authorization is requested within one month of the date the trial is instituted and the supplemental information is "relevant to a claim for which the trial has been instituted."  This rule, however, does not require us accept all supplemental information if timely submitted and relevant.  *Redline Detection, LLC v. Star Envirotech, Inc.*, 811 F.3d 435, 445 (Fed. Cir. 2015).  "The guiding principle for the PTAB in making any determination is to 'ensure efficient administration of the Office and the ability of the Office to complete IPR proceedings in a timely manner.'"  *Id.* at 445.  Timeliness and relevancy are "construed within the overarching context of the PTAB's regulations governing IPR and general trial proceedings.  Additionally, the PTAB has discretion to grant or deny motions as it sees fit."  *Id.* at 446-47 (citing 37 C.F.R. § 42.5(a), (b)).

### A. PROPOSED EXHIBITS A–D

Proposed Exhibits A-D are asserted to be relevant to construing the claim term "drum drip."  Motion 1.  Proposed Exhibit A is a product brochure for a condensate drain described as a "Pre-manufactured drum drip."  *Id.*, Ex. A, 1.  Proposed Exhibits B and C are U.S. patents directed to drains for sprinkler systems.  *Id.*, Exs. B, C.  The phrase "drum drip" is not used in the text of the Exhibit B and C patents.  Petitioner has not provided persuasive evidence or argument that the Exhibit B and C patents are relevant to construing the term drum drip.  Exhibit D is a U.S. patent that discloses a drum drip "condensate collector."  *Id.*, Ex. D.  The Exhibits A

and D documents are similar to the general disclosure in Viking of a drum drip drain. The challenged claims merely recite "drains including drum drip," without any further specific detail about the drum drip.

Petitioner has not explained sufficiently how the proffered supplemental information of a drum drip meets the threshold requirement for supplemental information to be "relevant to a claim for which the trial has been instituted," as set forth in Rule 42.123(a)(2). We understand that the proffered supplemental information is intended to provide evidence as to the meaning of "drum drip," which is a term recited in the challenged claims. Petitioner fails to explain, however, how evidence for use in the construction of this term is "relevant" in this proceeding, given that Viking uses the same word used in the claim, rendering construction seemingly unnecessary.

Petitioner argues it should be allowed to submit supplemental information to establish that the terms "condensate drain" and "drum drip" are synonymous. Motion 2–3. In the Petition, Petitioner asserted that "[d]rum drip is a term of art in the field of fire protection sprinkler systems." Pet. 6. In the Petition, Petitioner cited extrinsic evidence, U. S. Patent No. 4,849,739 (Ex. 1012) (referred to as "Loiacono" by Petitioner and herein), to "provide[] a succinct definition of a drum drip." *Id.* at 26. This was in the context of Petitioner's Grounds 3 and 4, on which we did *not* institute trial. Thus, Petitioner addressed the issue of defining "drum drip" and submitted extrinsic evidence to support its argument. This extrinsic evidence was considered in our Decision to Institute. DI 15. After discussing Loiacono, we stated "Petitioners do not cite any persuasive evidence to support their position that all condensate drains take the form of drum drips." *Id.*

Petitioner could have submitted with the Petition itself the additional exhibits it now proffers. Petitioner chose, instead, to rely on Loiacono.

Accordingly, based on the analysis above, we deny Petitioner's Motion to file Exhibits A–D. Moreover, we determine that admitting the supplemental information into the record at this time does not promote a just, speedy, or efficient resolution of the patentability of the challenged claims in this trial.

## B. EXHIBIT E

Exhibit E is a portion of a book disclosing proper care of nuclear power plant systems and equipment during construction and long outages. Motion, Ex. E, 1. As described in Exhibit E, nuclear plant operators must protect plant components from corrosion during construction, as well as during the long outages required for steam generator replacement, reactor recirculation system work, and other plant life extension activities. Petitioner asserts Exhibit E "supports Petitioners' contention of motivation to combine Wood and Viking," because it demonstrates the "common-sense" idea of venting gas from a piping network. *Id.* at 5. As discussed above, the evidence of record addresses the motivation or rationale for combining Wood and Viking. Petitioner has not explained sufficiently how the proffered supplemental information of the proper care of nuclear power plant systems and equipment meets the threshold requirement for supplemental information to be relevant to a claim directed to a dry pipe sprinkler fire protection system for which the trial has been instituted. Simply alleging that it "supports Petitioner's contention" is insufficient to meet that threshold requirement.

Moreover, we determine that admitting Exhibit E into the record at this time does not promote a just, speedy, or efficient resolution of the patentability of the challenged claims in this trial. Filing a petition is not a two-step process, wherein a petitioner submits the petition with a first set of exhibits, and then after our decision, in reaction to our determination, submits as a matter of right supplemental information to rebut determinations in our Decision. On the record before us, balancing timeliness and relevancy, and taking into consideration the efficient administration of this proceeding and the ability to complete it in a timely manner, we deny Petitioner's Motion to file Exhibit E.

### III.    ORDER

In consideration of the foregoing, Petitioner's Motion to file supplemental evidence is hereby denied.


PETITIONER:

Edward H. Green, III
egreen@coatsandbennett.com

David E. Bennett
dbennett@coatsandbennett.com

Brandee Woolard
bwoolard@coatsandbennett.com

PATENT OWNER:

Michael J. Thomas
MJTEFILE@HDP.COM

Bryan K. Wheelock
BWHEELOCK@HDP.COM

ipUNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

SOUTH-TEK SYSTEMS, LLC and POTTER ELECTRIC CO, LLC,
Petitioners

v.

ENGINEERED CORROSION SOLUTIONS, LLC,
Patent Owner.

---

Case IPR2016-00136
Patent 9,144,700 B2 ("the '700 Patent")

---

**NOTICE OF APPEAL OF FINAL DECISION
TO UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

OFFICE OF THE
GENERAL COUNSEL
2017 JUL 13 AM 11: 38
U.S. PATENT
AND
TRADEMARK OFFICE

Pursuant to 35 U.S.C. §§ 141-44, 319 and 37 C.F.R. § 90.2(a), notice is hereby given that Petitioners' South-Tek Systems, LLC and Potter Electric Co, LLC ("Petitioners") appeal to the United States Court of Appeals for the Federal Circuit from the Final Written Decision entered on May 10, 2017 (Paper No. 52), and from all underlying findings, orders, decisions, rulings and opinions, including, without limitation, those within the Decision on Institution of Inter Partes Review entered on May 12, 2016 (Paper No. 8).

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), Petitioners further indicate that the issues on appeal include, but are not limited to: determination of patentability of claims 1-9 of U.S. Patent No. 9,144,700 ("the '700 patent"), including factual and legal errors by the Patent Trial and Appeal Board in determining patentability; the dismissal by the Patent Trial and Appeal Board of Petitioners' motion to file supplemental information (Paper No. 22); the decision by the Patent Trial and Appeal Board refusing to construe claim terms at both institution and the final decision; and any finding or determination supporting or relating to those issues, as well as all other issues decided adversely to Petitioners in any orders, decisions, rulings and opinions related to IPR2016-00136.

RESPECTFULLY SUBMITTED,
COATS & BENNETT, P.L.L.C.

Dated: July 12, 2017

Edward H. Green, III
Registration No. 42,604

1400 Crescent Green, Suite 300
Cary, NC 27518
Telephone: (919) 854-1844
Facsimile: (919) 854-2084

# CERTIFICATE OF SERVICE UNDER 37 C.F.R. § 42.6(e)(4)

It is hereby certified that on this 12th day of July 2017:

(1) A copy of the foregoing document was filed, and appropriate filing fees paid,

electronically to:

| Clerk's Office | United States Court of Appeals for the Federal Circuit |
|---|---|
| PTAB – E2E | Patent Trial and Appeal Board |

(2) A copy of the foregoing document was delivered to the U.S. Post Office for

delivery via U.S. Express Mail to the following:

| Patent Trial and Appeal Board | PATENT BOARD<br>Patent Trial and Appeal Board<br>United States Patent and Trademark Office<br>P.O. Box 1450<br>Alexandria, VA 22313-1450 |
|---|---|
| Office of the General Counsel (Solicitor's General) | Office of the General Counsel<br>United States Patent and Trademark Office<br>P.O. Box 1450<br>Alexandria, VA  22313-1450 |

(3) A copy of the foregoing document was served via electronic mail upon the

following:

| Lead Counsel | Michael J. Thomas<br>Harness, Dickey & Pierce, PLC<br>7700 Bonhomme Avenue, Suite 400<br>St. Louis, MO 63105<br>mjtefile@hdp.com |
|---|---|
| Back-up Counsel | Bryan K. Wheelock<br>Harness, Dickey & Pierce, PLC<br>7700 Bonhomme Avenue, Suite 400<br>St. Louis, MO 63105<br>bwheelock@hdp.com |

RESPECTFULLY SUBMITTED,
COATS & BENNETT, P.L.L.C.

Edward H. Green, III
Registration No. 42,604

1400 Crescent Green, Suite 300
Cary, NC 27518
Telephone: (919) 854-1844
Facsimile:  (919) 854-2084

This packaging is the property of the U.S. Postal Service and is provided solely for use in sending Express Mail. Misuse may be a violation of federal law.

**EXPRESS MAIL**
UNITED STATES POSTAL SERVICE®

**EXPRESS MAIL**
UNITED STATES POSTAL SERVICE®

POSTAGE AND FEES PAID
www.usps.com

CORPORATE ACCOUNT

WWW.usp

Mailing Label
Label 11-F, April 2004

**Post Office To Addressee**

EXPRESS MAIL®

**DELIVERY (POSTAL USE ONLY)**

Delivery Attempt — Mo. Day — □ AM □ PM — Employee Signature

Delivery Attempt — Mo. Day — □ AM □ PM — Employee Signature

Delivery Date — Mo. Day — JUL 13 2017 — Time — USPTO MAIL CENTER — Employee Signature

□ WAIVER OF SIGNATURE (Domestic Mail Only) Additional merchandise insurance is void if waiver of signature is requested. I wish delivery to be made without obtaining signature of addressee or addressee's agent (if delivery employee judges that article can be left in secure location) and I authorize that delivery employee's signature constitutes valid proof of delivery.

NO DELIVERY □ Weekend □ Holiday

Customer Signature

TO: (PLEASE PRINT) — PHONE 571- 272-3000

Office of the General Counsel
USPTO
P.O. Box 1450
Alexandria, VA 22313-1450

Label 100, December 2006

**ORIGIN (POSTAL SERVICE USE ONLY)**

PO ZIP Code — 27511

Day of Delivery — □ Next □ 2nd □ 2nd Del. Day

Postage — $

Scheduled Date of Delivery — 7-13-11 — Return Receipt Fee

Scheduled Time of Delivery — □ 12 Noon □ 3 PM — COD Fee — $ — Insurance Fee — $

Military — □ 2nd Day □ 3rd Day

Flat Rate or Weight — lbs. 3 ozs. — Total Postage & Fees — $

Int'l Alpha Country Code

Mo. Day — Time Accepted — □ AM □ PM

Time Accepted — 6:06 — □ AM □ PM

Date Accepted — 7-10-11

Acceptance Emp. Initials

EM 748433614 US

**CUSTOMER USE ONLY**

METHOD OF PAYMENT:
Express Mail Corporate Acct. No. — 276044

FROM: (PLEASE PRINT) — PHONE 919- 654-1844

DAVID BENNETT
COATS & BENNETT
1400 CRESCENT GREEN DR
STE 300
CARY          NC 27518-8118
US

Federal Agency Acct. No. or
Postal Service Acct. No.

RM 5387-025

PRESS HARD, YOU ARE MAKING 3 COPIES.

U.S. PATENT AND TRADEMARK OFFICE